UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF LOUISIANA

ARIENTE S. WILLIAMS

VERSUS

UNITED STATES OF AMERICA

CIVIL ACTION

NO. 24-1680

SECTION M (5)

**FINDINGS OF FACT & CONCLUSIONS OF LAW**

This is a case involving a tort claim arising out of a motor vehicle accident. Plaintiff Ariente Williams filed this suit against the United States of America (the "government"), alleging that she was injured when her vehicle was rear-ended by a United States Postal Service ("USPS") truck. This matter was tried before the Court, sitting without a jury, over one day. Having considered the evidence admitted at trial, the arguments of counsel, the parties' posttrial submissions, and the applicable law, the Court issues its findings of fact and conclusions of law pursuant to Rule 52 of the Federal Rules of Civil Procedure. To the extent a finding of fact constitutes a conclusion of law, the Court adopts it as such, and vice versa.

**FINDINGS OF FACT**

I.  **JURISDICTION**

1.      Because this action arises under the Federal Tort Claims Act ("FTCA"), 28 U.S.C. §§ 2671-2680, this Court is vested with subject-matter jurisdiction pursuant to 28 U.S.C. § 1346(b). Williams timely filed an administrative tort claim and exhausted her remedies under the FTCA prior to filing this civil action.[1]

---

[1] R. Docs. 1 at 2; 46 at 2, 5.

2.      Venue is appropriate in the Eastern District of Louisiana pursuant to 28 U.S.C. § 1402(b) because the act or omission complained of occurred within the district.[2]

## II.    THE PARTIES

3.      Williams is an individual of full age of majority, who is a citizen of Allen Parish, Louisiana.  At the time of the subject accident, she was splitting her time between New Orleans, Louisiana, and Oakdale, Louisiana.[3]

4.      The government is the proper party-defendant to an action brought under the FTCA for damages allegedly caused by an employee of one of its agencies acting in the course and scope of his employment.[4]

## III.    THE ACCIDENT AT ISSUE

5.      On January 5, 2020, Warren Daniels, acting in the course and scope of his employment with USPS, was driving a tractor-trailer owned by the USPS near the Superdome in New Orleans.[5]

6.      At the time of the accident, Daniels was an experienced commercial driver.  He had held a valid commercial driver's license since 2006, and he had been driving tractor-trailers for the USPS since 2018.[6]

7.      Williams, who had just completed a shift working at a concessions stand during a New Orleans Saints game, was driving a Nissan Sentra away from the Superdome in stop-and-go traffic on Dave Dixon Drive/Girod Street, emerging from an underpass and approaching the intersection with S. Liberty Street.  She was headed to her parents' house in Harvey, Louisiana.[7]

---

[2] R. Doc. 1 at 2.
[3] Testimony of Williams; R. Docs. 1 at 1; 46 at 2.
[4] Testimony of Williams; R. Docs. 1 at 1; 46 at 2.
[5] R. Doc. 46 at 5; Testimony of Daniels.
[6] Testimony of Daniels.
[7] Testimony of Williams.  The street known as Dave Dixon Drive by the Superdome changes names to Girod Street as one moves away from the stadium and towards the river.

8.     Willaims bumped into a dark-colored SUV in front of her car at the underpass.  She and the other driver exited their respective vehicles to assess the damage.  Seeing no property damage and sustaining no personal injuries, both drivers reentered their vehicles without exchanging information.[8]

9.     Daniels was scheduled to pick up mail from the airport, but he was not in a rush, so he had his tractor-trailer parked on the curb of S. Liberty Street and was waiting for traffic to subside to make a right-hand turn onto Girod Street.[9]

10.     Daniels knew that it would be unsafe on his own to attempt to merge into the heavy post-game vehicular and pedestrian traffic.[10]

11.     A uniformed New Orleans Police Department ("NOPD") officer approached Daniels's cab and offered to stop traffic to direct Daniels's turn.  Daniels, who was uncomfortable moving his vehicle into the traffic, told the officer that he was not in a rush.[11]

12.     A few minutes later, the officer returned to Daniels's cab a second time, stepped onto the running board, and reiterated his offer to stop traffic and direct Daniels's turn onto Girod. Daniels again said that he was in no rush and could wait for the traffic to subside, but the officer began directing traffic anyway to allow Daniels to make the right turn onto Girod Street.[12]

13.     Two other uniformed traffic officers held vehicular and pedestrian traffic in both directions on Girod to further facilitate the guided directions from the first officer during Daniels's right-hand turn.  One of the officers held traffic heading in the same direction as Williams's line

---

[8] *Id.*
[9] Testimony of Daniels.
[10] *Id.*
[11] *Id*.  The NOPD's traffic investigation report and the USPS accident report both note that an unidentified traffic officer at the scene was directing Daniels's right-hand turn at the time of the accident.  R. Doc. 46 at 5; Trial Exs. 1, 2.
[12] Testimony of Daniels.

of travel (*i.e.*, away from the Superdome) and, so, was located on the passenger side of the truck (*i.e.,* Daniels's blind spot).  The other officer held traffic heading back toward the Superdome.[13]

14.     The officer who approached Daniels did not order Daniels to move his vehicle, but Daniels felt that he could not ignore the officer either.[14]

15.     At this officer's direction, Daniels proceeded to make the right-hand turn, moving cautiously and at a low rate of speed in response to the officer's hand motions.[15]

16.     Daniels was checking his mirrors while he made the turn.[16]

17.     Daniels did not press the gas pedal, but rather allowed the tractor-trailer to move forward under its own power by taking his foot off of the brake.[17]

18.     The directing officer was positioned in front of the tractor-trailer when guiding Daniels and could not see the vehicles on the right-hand side of the truck after it began making the turn, but another of the NOPD officers holding traffic was located on that side, within the line of sight of the first officer, and she could see the vehicles on that side of the truck.[18]

19.     Daniels saw Williams's vehicle before making the turn and knew that that she would be in the blind spot on his right side.[19]

20.     Daniels was relying on the officers who were giving directions and stopping traffic to make sure he had sufficient clearance around William's vehicle while making the right-hand turn onto Girod.[20]

---

[13] *Id.*
[14] *Id.*
[15] *Id.*; Trial Exs. 1, 2.
[16] Testimony of Daniels.
[17] *Id.*
[18] *Id.*
[19] *Id.*
[20] *Id.*

21.     Daniels's trailer collided with the back of Williams's car and pushed her into the SUV in front of her.[21]

22.     Specifically, the point of impact was between the rear, passenger side of the tractor-trailer, near the back wheels (which was in Daniels's blind spot), and the rear, driver's side portion of Williams's car.[22]

23.     The officer continued to direct Daniels to move his truck forward right up to, and including, the moment of its impact with Williams's vehicle.[23]

24.     Williams felt the impact before she realized that her car was hit by the USPS truck. She described the impact on her vehicle as "low and direct."[24]

25.     Williams's car had damage to the rear and front, but the airbags did not deploy.[25]

26.     Daniels stopped his truck when he felt the impact.[26]

27.     The NOPD officer who was directing Daniels's turn removed his visibility vest and left the scene.  He was never identified.[27]

28.     A separate NOPD patrol unit eventually arrived on the scene to investigate the accident and write a report.[28]

29.     The NOPD accident report contains a detailed summary of the event, reciting in part:

> Driver of vehicle 1 stated he was on the farthest left lane on Julia Street making a wide right turn onto Dave Dixon Drive going lakebound.  He stated he was being directed by officers on traffic control to make the turn.

---

[21] *Id.*; Testimony of Williams; R. Doc. 46 at 5; Trial Ex. 3.
[22] Testimony of Daniels; Trial Exs. 1, 2.
[23] Testimony of Daniels.
[24] Testimony of Williams; Trial Ex. 13.
[25] Testimony of Daniels; Trial Ex. 2.
[26] Testimony of Daniels.
[27] *Id.*; Trial Ex. 2.
[28] Trial Exs. 2, 18, 18A.

He made the turn and did not realize vehicle 2 [was] in his blind spot. He struck the rear of vehicle 2 with the right side of vehicle 1's cargo body.[29]

30.    After describing certain other details of the accident, the report continues: "The officers conducting traffic were no longer on scene when [the investigating] officers arrived on scene.  Therefore [the investigating] officers could not get contact information."[30]

31.    The report states that Daniels was deemed to be at fault for the collision.[31]

32.    The USPS conducted its own investigation and prepared its own accident report. That report indicates the following in the section describing "what happened":

> NOPD was controlling the traffic at Girod and S. Liberty when employee was being merged into traffic by the Officer.  Employee proceeded into traffic making a right turn around an existing accident.  Employee was following Officers [sic] instructions when he struck the back of the left side of a Nissan pushing it further into the Tahoe causing more damage.[32]

33.    Daniels was not under the influence of any drugs or alcohol at the time of the accident.[33]

34.    Daniels was disciplined: he was given a one week's driving suspension; he was required to take an 8-hour driving course; and he had to be recertified as an instructor.[34]

35.    After the accident, Williams felt pain in the left side of her body, from her neck to her ankle, which included pain in her back, shoulder, knee, and ankle.[35]

36.    Williams called her mother to let her know that she and been in an accident.[36]

---

[29] Trial Ex. 2 at p. NOPD0002.  S. Liberty Street is referred to as Julia Street in the police report.  The report's "lakebound" directional reference is dubious as the turn would have had the tractor-trailer moving toward the river, not the lake.

[30] *Id.* at p. NOPD0009.

[31] *Id.*

[32] Trial Ex. 1 at p. USA000005.  *See also id.* at p. USA000009.

[33] Testimony of Daniels.

[34] *Id.*

[35] Testimony of Williams; Trial Exs. 6, 7.

[36] Testimony of Williams.

37. Williams was taken by ambulance to University Medical Center before the investigating officers arrived.[37]

38. Williams did not have any head injuries or lose consciousness.[38]

39. At University Medical Center, attending physicians administered Tramadol for pain and conducted x-rays of Williams's cervical spine and thoracic spine and a CT of her head. She was diagnosed with cervical strain and mid-back pain, but her x-rays showed no acute traumatic injury, fracture, or alignment abnormalities. Medications prescribed for pain included Baclofen (a muscle relaxer) and Naproxen (an anti-inflammatory). She was discharged the same day with instructions for follow-up care.[39]

40. Williams's vehicle sustained $8,986 in damage and was determined to be a total loss by her insurance company.[40]

41. State Farm, Williams's automobile insurer, paid Williams $7,634 for the vehicle as a total loss.[41]

**CONCLUSIONS OF LAW**

1. This case was filed against the government under the FTCA.

2. The FTCA is a limited waiver of the government's sovereign immunity. *See Coleman v. United States*, 912 F.3d 824, 835 (5th Cir. 2019) (explaining the effect of 28 U.S.C. § 1346(b)(1)).

---

[37] Testimony of Williams; Trial Exs. 2, 11.

[38] Testimony of Williams; Trial Exs. 6, 31.

[39] Testimony of Williams and Pam Farmer; Trial Exs. 6, 31. In view of the Court's legal conclusions regarding liability, the Court will not now make any findings of fact concerning Williams's subsequent medical treatment or alleged injuries. Nor will the Court make any findings regarding the incidents the government contends reveal preexisting injuries or intervening and superseding causes of the injuries Williams described at trial.

[40] R. Doc. 46 at 6.

[41] *Id.*

3.      Specifically, the FTCA provides a waiver of sovereign immunity for "civil actions on claims against the United States, for money damages ... for ... personal injury ... caused by the negligent or wrongful act or omission of any employee of the Government while acting within the scope of his office or employment, under circumstances where the United States, if a private person, would be liable to the claimant in accordance with the law of the place where the act or omission occurred."  28 U.S.C. § 1346(b)(1).

4.      It is undisputed that Daniels was acting in the course and scope of his employment with the USPS at the time of the accident.[42]

5.      "'[T]he "law of the place" means law of the State – the source of substantive liability under the FTCA.'"  *Coleman*, 912 F.3d at 835 (quoting *FDIC v. Meyer*, 510 U.S. 471, 478 (1994)).

6.      Louisiana tort law applies in this case because the accident occurred in Louisiana.

7.      Louisiana Civil Code article 2315 provides that "[e]very act whatever of man that causes damage to another obliges him by whose fault it happened to repair it."

8.      "Louisiana courts have adopted a duty-risk analysis in determining whether to impose liability under the general negligence principles as set forth in the Civil Code."  *Jenkins v. Hernandez*, 305 So. 3d 365, 371 (La. App. 2020) (citing *Brewer v. J.B. Hunt Transp., Inc.*, 35 So. 3d 230, 240 (La. 2010)).

9.      To prevail under the duty-risk analysis, the plaintiff must prove by a preponderance of the evidence the following elements: (1) the defendant had a duty to conform his or her conduct to a specific standard (the duty element); (2) the defendant failed to conform his or her conduct to the appropriate standard (the breach-of-duty element); (3) the defendant's substandard conduct

---

[42] *Id.* at 7.

was a cause-in-fact of the plaintiff's injuries (the cause-in-fact element); (4) the defendant's substandard conduct was a legal cause of the plaintiff's injuries (the scope-of-liability or scope-of-protection element); and (5) actual damages (the damages element). *Id.*

10. "A negative answer to any of the inquiries of the duty-risk analysis results in a determination of no liability." *Lemann v. Essen Lane Daiquiris, Inc.*, 923 So. 2d 627, 633 (La. 2006) (citing *Mathieu v. Imperial Toy Corp.*, 646 So. 2d 318, 326 (La. 1994)).

11. "Generally, there is an almost universal legal duty on the part of a defendant in a negligence case to conform to the standard of conduct of a reasonable person in like circumstances." *Davis v. Witt*, 851 So. 2d 1119, 1128 (La. 2003) (citing *Joseph v. Dickerson*, 754 So. 2d 912, 916 (La. 2000); *Boykin v. Louisiana Transit Co.*, 707 So. 2d 1225, 1231 (La. 1998)).

12. "Whether a legal duty exists, and the extent of that duty, depends on the facts and circumstances of the case, and the relationship of the parties." *Id.* (citing *Socorro v. City of New Orleans,* 579 So. 2d 931, 938 (La. 1991)).

13. "All motorists have a never-ceasing duty to maintain a sharp lookout and to see that which in the exercise of ordinary care should be seen." *Theriot v. Bergeron*, 939 So. 2d 379, 383 (La. App. 2006) (citing *Duzon v. Stallworth*, 866 So. 2d 837, 859 (La. App. 2002)).

14. Louisiana courts have recognized that, because professional "truck drivers are required to undergo testing and licensure which involve attending a special school designed to teach the mechanics and attendant hazards of operating large rigs," they are "superior actor[s] in the eyes of the law" and "held to a higher standard of care to the motoring public." *Davis*, 851 So. 2d at 1128-29 (collecting cases).

15.     A truck driver's duty "includes the duty to know the machine he is operating and the size of the trailer and, thus, to ascertain whether he has enough clearance" to make a turn. *See Theriot*, 939 So. 2d at 383.

16.     However, "La. R.S. 32:5 vests all law enforcement officers of the state or its political subdivisions with authority to direct, control or regulate traffic and enforce the provisions of the Traffic Code and regulations of the Department of Public Safety." *Blair v. Tynes*, 621 So. 2d 591, 595-96 (La. 1993).

17.     The duty imposed by La. R.S. 32:5 "is of such great significance that under certain circumstances a motorist or pedestrian is relieved of liability for causing an accident if s/he acted in accordance with directions of a traffic control officer." *Id.* at 596 (discussing relevant cases).

18.     "Law enforcement officers are duty bound to exercise [their power to control traffic] reasonably to protect life and limb and to refrain from causing injury or harm." *Id.* (citing *Lejeune v. Allstate Ins. Co.*, 365 So. 2d 471 (La. 1978); *Prattini v. Whorton*, 326 So. 2d 576 (La. App. 1976)).

19.     Pursuant to La. R.S. 32:56(A), "[n]o person shall fail or refuse to comply with any lawful order or direction of any police officer … invested by law with authority to direct, control, or regulate traffic."

20.     This statute "impose[s] a duty upon a motor vehicle operator to comply with any lawful order or directive of any police officer invested by law with the authority to direct, control or regulate traffic, irrespective of the instructions or signals of a traffic control device." *Theriot*, 939 So. 2d at 383 (citing *Landry v. State Farm Ins. Co.,* 529 So. 2d 417, 421 (La. App. 1988); *Goff v. Sarradet,* 394 So. 2d 655, 656 (La. App. 1980)).

21.    The *Theriot* court explained:

> Under certain circumstances, a motorist will be relieved of liability for causing an accident if he acted in accordance with directions of a traffic control officer. While directions of a traffic officer do not completely relieve a motorist of all obligations, where the testimony shows clearly that the defendant motorist moved forward in compliance with the directions of the traffic officer at a slow speed and in a careful and prudent manner, he cannot be charged with negligence.

*Id.* at 383-84 (first citing *Blair*, 621 So. 2d at 596, and then citing *Sutter v. Travelers Ins. Co.*, 167 So. 2d 517, 518 (La. App. 1964)).

22.    In *Theriot*, the plaintiff, an employee of the Louisiana Department of Transportation and Development ("DOTD"), was suspended above an intersection fixing a traffic signal in an extendable bucket attached to a DOTD truck, while a Louisiana state trooper directed traffic. *Id.* at 381. The plaintiff's bucket was hit by a tractor-trailer after the officer directed the driver of that vehicle to proceed. *Id.* The driver testified that he proceeded through the intersection at less than ten miles per hour when the officer waved him through, both of them believing he could safely pass under the bucket. *Id.* at 384. Applying the above-cited principles, the appellate court upheld the trial court's finding that the truck driver bore no liability for the accident. *Id.* at 385.

23.    In *Guidry v. Livingston Parish Sheriff's Department*, the appellate court, applying the same principles, upheld the trial court's finding of no fault on the part of a driver who proceeded slowly through an intersection at the direction of, and in reliance on, two officers who were directing traffic. 2009 WL 2514416, at *6-7 (La. App. Aug. 18, 2009).

24.    Here, Daniels testified that he made the right-hand turn at the instance and direction of a police officer that was directing traffic. Daniels testified that he had no intention of moving his vehicle into the traffic until the officer that was directing traffic insisted that he could help Daniels make the right-hand turn. Daniels stated multiple times that, when the officer approached

him for the second time (this time standing on his running board), he did not think he was at liberty to ignore the officer's directions. Daniels further testified that there were three officers involved, one in front of his truck motioning him forward, and two at the rear who stopped vehicular and foot traffic in both directions while he proceeded to turn. The officers were in a position superior to that of Daniels to see the traffic in the tractor-trailer's blind spot and Daniels was relying upon their signals and directions. Daniels proceeded slowly and carefully, while checking his mirrors. Indeed, he testified that he never pressed the gas pedal, but instead allowed the truck to ease forward under its own power by taking his foot off of the brake.[43]

25.      There is nothing in the record to contradict Daniels's testimony that he proceeded slowly and carefully at the direction of a police officer who was charged with directing traffic. The Court concludes that Daniels was operating his tractor-trailer in a safe manner when making the right-hand turn at the behest, direction, and control of the NOPD officer, as required by La. R.S. 32:56(a), and that he took reasonable steps to ensure that he proceeded in a careful and safe manner, which included proceeding cautiously and following the hand signals of the NOPD officer who directed him through the turn. Under these circumstances, Louisiana jurisprudence establishes that Daniels has no liability for the accident.

## **CONCLUSION**

Accordingly, for the foregoing reasons,

IT IS ORDERED that there be judgment in favor of defendant the United States of America, and against plaintiff Ariente S. Williams, DISMISSING WITH PREJUDICE Williams's claims.

---

[43] Testimony of Daniels.

New Orleans, Louisiana, this 27th day of May, 2026.

_____
BARRY W. ASHE
UNITED STATES DISTRICT JUDGE